United States District Court
Eastern District of New York

1:18-cv-02250-NGG-RML

| | |
|---|---|
| Marilyn Reyes individually and on behalf of all others similarly situated | |
| Plaintiff | |
| - against - | First Amended Complaint |
| Crystal Farms Refrigerated Distribution Company | |
| Defendant | |

The above-named plaintiff individually and on behalf of all others similarly situated, by attorneys, alleges upon information and belief, except for those allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Crystal Farms Refrigerated Distribution Company ("defendant") distributes, markets, labels and sells refrigerated ready-to-eat mashed potatoes under the "Diner's Choice" brand (the "Products").

2.      The Products are available in no fewer than the following varieties:

- Traditional Mashed Potatoes
- Garlic Mashed Potatoes
- Country Style Mashed Potatoes
- Sweet Mashed Potatoes

3.      The Products are sold to consumers by third-parties from brick-and-mortar stores and online, and available in 24 and 32-ounce packages.

4.      The front labels include (i) an image of mashed potatoes, (ii) ingredients which distinguish that variety (i.e., graphical image of garlic), (iii) a slab of butter, (iv) "Made With REAL BUTTER" in a golden "seal" and (v) "Made With Fresh Whole Potatoes," also contained on the side flaps of the Products.

1







5.    The representations are misleading because despite the centrality of butter to their

marketing and labeling, they also contain margarine, as the third ingredient listed below.

Information Panel                                    Ingredient List



INGREDIENTS: POTATOES, WHOLE MILK, BUTTER (CREAM, SALT),
MARGARINE (LIQUID AND HYDROGENATED SOYBEAN OIL, WATER, SALT,
CONTAINS LESS THAN 2% OF WHEY SOLIDS, VEGETABLE MONO &
DIGLYCERIDES, SOY LECITHIN, SODIUM BENZOATE (PRESERVATIVE)),
SALT, CONTAINS ½% OR LESS OF THE FOLLOWING: DISODIUM
PYROPHOSPHATE (ADDED TO MAINTAIN COLOR), GARLIC, POTASSIUM
SORBATE AND SODIUM BISULFITE (ADDED TO MAINTAIN FRESHNESS)

PARTIALLY PRODUCED WITH GENETIC
ENGINEERING (MARGARINE)

6.    This is especially misleading owing to the brand name, "Diner's Choice," because

2

consumers (diners) know that when they sit down at the table for mashed potatoes – whether Thanksgiving or another special occasion with family and friends – they will make a choice.

7.      When consumers eat mashed potatoes, they are typically prepared or consumed with fats and oils, like butter or margarine.

8.      The naturally dry texture of potatoes requires a lipid ingredient to enhance their texture, viscosity, palatability and to provide lubrication in the mouth.

9.      Consumers prefer butter over margarine in potatoes because they prefer butter's:

• unique and unduplicated taste, owing to more than 120 naturally occurring flavor compounds including methyl ketones and lactones;
• ability to enhance the texture and other qualities of (mashed) potato products;
• mouthfeel, since butter melts at a normal body temperature, while margarine has a higher melting point, resulting in a greasy aftertaste on the palate.

10.      However, when purchasing and consuming defendant's Products, they do not get to make that all-important decision – choosing butter *or* margarine – and instead, they get both despite believing they will only be having butter.

11.      Butter and margarine are rival food products unlike any other which have existed.

12.      The conflict between butter and margarine has been greater than that of any other food products that could allege to be rivals – i.e., grain vs. whole grain, natural fruit vs. fruit with artificial ingredients, organic v. non-organic (conventional).[1]

13.      Butter is the quintessential natural and simple food, produced by churning the cream

---

[1] Margarine vs. butter: one of history's hottest rivalries?, Rivalry: TMSIDK Episode 17 – Freakonomics, Podcast, 4 June 2017, accessed 12 November 2017; J.H. Young, *"'This Greasy Counterfeit'": Butter Versus Oleomargarine in the United States Congress, 1886*, Bulletin of the History of Medicine, Fall (1979), 53.3, pp. 392-414; J. Bourdieu et al., *"That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266; Distillations Science + Culture + History, Butter vs. Margarine: one of America's most bizarre food battles, Podcast, 14 November 2017.

at the top of a cow's milk until the fat solidifies.

14.    According to archaeologists, butter was discovered accidentally by nomadic herdsmen of the Neolithic-era, who attached sacks containing milk to their pack animals, and after days of jostling, the milk would be churned into butter.

15.    Margarine, on the other hand, was invented because of the French government's efforts to develop a lower quality and cheaper butter alternative in the late 19th century.

16.    Margarine is made by converting vegetable oils from liquid to solid through hydrogenation, fractionation and interesterification, in the presence of chemical and enzymatic catalysts.

17.    From the beginning of margarine's introduction to the U.S., there was coordinated opposition by the dairy lobby, resulting in The Oleomargarine Act of 1886, which taxed margarine and defined butter.[2]

18.    Numerous states banned margarine altogether, while others outlawed the practice of margarine manufacturers coloring their product yellow to fraudulently sell it as butter.[3]

19.    Margarine producers fortified their product with Vitamin A to better imitate butter, "between the expensive, genuine article [butter] and its cheaper surrogate [margarine] ('artificial butter', as it was dubbed) …The rivalry had a long history.  Margarine, an industrial good, had mimicked the 'natural', time-honored butter ever since its invention in 1869."[4]

20.    Even a Supreme Court Justice Judge John Marshall Harlan offered thoughts on butter and margarine, stating:

---

[2] Geoffrey P. Miller, *Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine*, Cal. Law Review 77 (1989) (describing the rise of the dairy lobby in response to margarine's introduction to the U.S.); W. T. Mickle, *Margarine Legislation*, American Journal of Agricultural Economics (Aug. 1941).
[3] April White, *When Margarine Was Contraband*, JSTOR Daily, 24 Aug. 2017, accessed 15 October 2017; The Butter vs. Margarine Wars Sweep Vermont in 1900, New England Historical Society, accessed 10 November 2017.
[4] J. Bourdieu et al., "*That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266.

[T]he real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk.[5]

21.    To prevent this deception against consumers, several states required margarine be dyed pink, red and brown, so that consumers would not confuse it with butter.[6]

22.    The Great Depression and World War II caused margarine consumption to increase, due to its lower cost, and the rationing and shortages of butter.

23.    In the post-war decades, margarine consumption surpassed butter, because of its low price, convenience and public health guidance which warned against saturated fats in butter.

24.    By the mid-1970s, margarine consumption was three times that of butter.

25.    Gradually, scientists reassessed the harm of saturated fat (butter) and discovered that margarine contained even more harmful trans fats, caused by hydrogenation.

26.    Additionally, scientific consensus shifted from holding fat content responsible for the epidemic of health-related issues as opposed to other food components, such as sugar.

27.    This reassessment of fat – the type and amount consumed in one's diet –

coincided with the country's natural food trends: guided by nutritionists' evolving consensus, consumers became suspicious of highly processed foods full of refined grains, added sugars, and, yes, vegetable oils, all of which bore little resemblance to foods found in the natural world.[7]

28.    Margarine has come to epitomize an "undesirable artificiality" due to its shelf-stability and low price.

29.    According to the NYU Professor of Nutrition Marion Nestle,

---

[5] Michael J. Pettit, *The unwary purchaser: Consumer psychology and the regulation of commerce in America*, Journal of the History of the Behavioral Sciences 43.4 (2007): 379-399.

[6] Rebecca Rupp, *The Butter Wars: When Margarine Was Pink*, National Geographic Blog – The Plate – Serving daily discussions on food (Aug. 13, 2014); see also Ruth Dupré, *"If It's Yellow, It Must be Butter": Margarine Regulation in North America Since 1886*, Journal of Econ. History, (1999).

[7] Amidst Natural Food Trends, Margarine Becomes Marginal, TrendSource, 18 October 2017, accessed 1 October 2018.

Margarine has become a marker for cheap, processed, artificial, unhealthy food. The irony is hilarious. Unilever went to a lot of trouble to formulate healthy margarines, but the zeitgeist has caught up with them.[8]

30.    Professor Nestle was referring to the decision by Unilever – the world's largest margarine producer – to sell its "spreads" division.

31.    Though margarine manufacturers attempted to capture consumer enthusiasm for natural and less processed foods like butter by *adding* it *with* margarine, this tactic was rejected by consumers:

Adding a little butter to the company's margarine wasn't going to change that perception: If people want butter, they want butter.[9]

32.    The evidence indicates a resurgence of real foods like butter and even lard, since these foods are not made with artificial ingredients, preservatives or synthetic substances.[10]

33.    Even the commercial food processing trade publications have recognized that consumers' affinity for butter is matched with an avoidance of its overly processed and artificial competitors, with Food Ingredients First noting:

Consumers are also increasingly looking for natural products that taste good and they want to understand the ingredient list of their foods. Butter is as natural as it gets, made of just cream, or cream and salt – so butter offers food manufacturers the ability to have a clean, understandable ingredients list on their products.[11]

34.    Food Business News echoed the pro-butter sentiment, reporting that:

Butter is back as a growing number of consumers turn their backs to foods perceived as artificial, such as vegetable oil-based margarine. Fresh from the farm, and churned the same way for generations, butter's comeback may be attributed to its simplicity and its deliciousness.[12]

35.    One food industry executive pointed out that "Butter consumption is up 25% in the

---

[8] Why the King of Margarine Wants Out, Justin Fox, Bloomberg, 6 April 2017, accessed 15 November 2017.
[9] *Id*.
[10] *Id*.
[11] Butter: A healthy fat or fad?, Food Ingredients First, 10 April 2018, accessed 24 June 2018.
[12] Butter innovations churning retail sales, Donna Berry, Food Business News, 14 June 2016, accessed 19 September 2018.

last 10 years" and that "Butter is benefiting from consumers' desire for fresh, real and natural products," while demand for margarine continues to reach new depths.[13]

36.    This can be seen by the ingredients used to make butter – cream, salt or both – whereas margarine and other artificial spreads contain a host of ingredients which would require a chemistry textbook to understand.[14]

37.    The comments of the Director of Nutrition at the Center for Science in the Public Interest, Bonnie Liebman, on consumer perceptions of these two products were apt: "Butter has a more natural image. I think people have always been a bit suspicious about margarine."

38.    According to Mintel, the leading global market research firm, part of the reason for butter consumption now exceeding margarine is because 68% of consumers recognize butter as pure, natural, simple and minimally processed while margarine contains *too many* artificial ingredients.[15]

39.    This distinction is evident from their sub-ingredients in the Products.

<u>Butter</u>

- Cream
- Salt

<u>Margarine</u>

- Liquid and Hydrogenated Soybean Oil
- Water
- Salt
- Contains Less than 2% of
  - Whey Solids
  - Vegetable Mono & Diglycerides
  - Soy Lecithin
  - Sodium Benzoate (Preservative)

40.    The desire for plaintiff and reasonable consumers to have products with butter stems

---

[13] *Id.*
[14] Supra, note 7 and 8.
[15] Mintel, *Report on Butter, Margarine and Spreads – US (Aug. 2011)*; Brenda Reau, *Butter is Gaining Ground with Consumer Demand for Natural Products*, Michigan State University Extension Product Center (Sep. 15, 2011).

from a realization of the goodness of simple, less processed foods, of which butter is a prime example.

41.     More significant than any difference between butter and margarine over the exact amount of micronutrients or grams of certain components is the desire of plaintiff and consumers to eschew artificial and synthetic foods in favor of natural and simpler ones – butter vis-à-vis margarine.

42.     Reasonable consumers, the FDA, and Congress, understand "synthetic" to be a synonym for "artificial."

43.     "Synthetic" is commonly defined as refer to a substance that is formulated or manufactured through a chemical process or intervention which chemically alters a substance extracted from naturally occurring sources, such as plants, animals, or minerals, excluding substances created by naturally occurring processes.

44.     No reasonable consumer expects a product which emphasizes butter to contain its artificial opposite, made of chemical ingredients in addition to genetically modified organisms (GMOs), *infra*.

45.     To the extent reasonable consumers consume butter *and* margarine, this would only be done in separate foods (i.e., butter for baking muffins, margarine for preparing vegetables), instead of using a bit of each within the same food.

46.     This is similar to how most people would prefer watching an entire movie (even a bad film) instead of seeing half of two highly regarded movies – variety is not always preferred.

47.     These preferences are borne out by looking at how consumers eat mashed potatoes, through a review of Allrecipes.com, which has more user-contributed recipes than any other site

and is the most-visited recipe site.[16]

48.     This is shown and can be replicated by visiting google.com and entering the two combinations of Search Terms 1 and 2 followed by "site:allrecipes.com/recipe," as shown below.

| Subdomain URL | Search Term 1 | Search Term 2 | Results |
|---|---|---|---|
| site:allrecipes.com/recipe | "mashed potatoes" | "butter or margarine" | 171 |
| | | "butter and margarine" | 0 |

49.     When "mashed potatoes" is combined with "butter or margarine," Allrecipes.com retrieves 171 distinct, user-generated recipes which include "mashed potatoes" in the name (i.e., Whipped Mashed Potatoes, Rosemary Mashed Potatoes, etc.).

50.     In contrast, where "mashed potatoes" is combined with "butter and margarine," Allrecipes.com is unable to locate a single entry.

51.     This illustrates that when consumers have mashed potatoes, they will seek a version which has butter or margarine, but never both.

52.     Consumers reasonably expect food manufacturers to make products in a way that is familiar and appealing to them, based upon their typical experiences making foods at home and ingredient preferences and they have responded, reformulating products to match this demand.[17]

53.     Food Navigator, another food industry publication, has reported that "that there's actually much more consumer focus on front-of-pack claims than on the ingredient list" when it

---

[16] According to the Alexa.com, the premier commercial internet traffic data firm, and eBizMBA.com, which combines data from Alexa with other similar services such as Compete and Quantcase.
[17] Survey Says Consumers Prefer Natural, Homemade Tasting Food, Natural Products Insider, 12 September 2013

comes to matching consumer preferences, quoting the director of marketing for DuPont Nutrition & Health in North America.[18]

54.    Across the food industry, companies big and small have embarked on efforts to put out products which appeal to consumers seeking foods like they would make at home.

55.    Natural Products Insider described what consumers expect when purchasing a product like the mashed potatoes of defendant – "[A] ready-made dish that requires simple heating takes the pressure off a busy weeknight, but for an increasing number of consumers, it also must have a *homemade character*." (emphasis added).[19]

56.    Competitor refrigerated mashed potatoes of Pineland Farms, often adjacent to defendant's on grocery shelves, below, only use butter, which indicate there are no technological challenges in food processing which necessitate the use of margarine.

<u>Front Label</u>                                            <u>Ingredients</u>




---

[18] Elaine Watson, <u>Who is driving the clean label agenda, and what does clean really mean?</u>, Food Navigator, 9 March 2012.

[19] Cindy Hazen, Addressing Texture Challenges in Clean Label Prepared Foods, Natural Products Insider, 3 July 2018,

57.     Consumers' strong preferences for butter or margarine have not just been highlighted by food industry executives, but by writers, researchers and scientists of every stripe.[20]

58.     One commentator described her experiences in a way which would seem familiar to Americans:

> I was hosting a dinner party for friends once, when someone asked me to pass the butter. The woman, a neighbor, hesitated for a moment, and then asked if it was butter or margarine.
>
> "Butter," I said.
>
> "Oh, good," she said.
>
> Someone else nodded in agreement. Another declared he hadn't had margarine in years.
>
> Soon the margarine-bashing began. The color: too yellow. The texture: waxy. A friend's husband went so far as to say he always knew what kind of house he was in by the butter or butter substitute they served, and those homes that served butter substitutes would not have him as guest again anytime soon. You'd think someone had mentioned taxes or lutefisk, so palpable was the disgust.[21]

59.     Food scientists who have studied the usage of butter vis-à-vis margarine confirmed these strong sentiments, noting that "consumers appeared to fall primarily into two groups: butter-only consumers, and margarine + butter consumers," because margarine loyalists "often used butter for special occasions or for baking."[22]

---

[20] Nina Martyris, *Operation Margarine: Tracing the Wartime Rise of Ersatz Butter*, Harper's Magazine – Blog (May 2, 2014) (describing the intensity of reactions brought about by replacing butter with margarine and noting "Margarine thrives on adversity, and its origins are rooted in it."); Libby Copeland, *New Book Clarifies Butter's Spread and Chronicles Its Wars With Margarine*, Smithsonian.com (Nov. 21, 2016)  ("For decades there's been a huge butter versus margarine debate").

[21] Paula Carter, *Margarine: A Public and Personal History*, The Rumpus, 2 August 2013, accessed 23 November 2017.

[22] A.J. Krause, *Identification of the Characteristics that Drive Consumer Liking of Butter*, Journal of Dairy Science (2007).

60.     Another study came to a similar conclusion – though margarine users are open to having butter, those who prefer butter are unlikely to use margarine.[23]

61.     In addition to the artificial preservatives which belie the Products' aura of "fresh, whole potatoes" and "real butter," the margarine is made from genetically modified organisms (GMOs), as indicated below the ingredient list:  PARTIALLY PRODUCED WITH GENETIC ENGINEERING (MARGARINE).

62.     In other words, the artificiality of the margarine is *enhanced* by the inclusion of GMOs.

63.     Monsanto, the largest global producer of genetically modified seeds has described GMOs as "Plants or animals that have had their genetic makeup altered," whereby "genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."

64.     The Environmental Protection Agency ("EPA") has distinguished conventional breeding, occurring through cross-pollination, from genetic engineering using modern scientific techniques.

> For a plant-incorporated pesticide, one would breed a plant that produces a pesticide with a sexually compatible plant that does not possess this property but possesses other properties of interest to the breeder, e.g., sweeter fruit.  Then, out of the offspring, the breeder would choose the offspring plant that produces the pesticide, and therefore expresses the desired pesticidal trait, as well as producing sweeter fruit.

---

[23] M. Michicich, *Consumer Acceptance, Consumption and Sensory Attributes of Spreads Made from Designer Fats*, Food Quality and Preference (1999).

Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material. For example, a desired gene that produces a desired pesticide [](e.g., the insecticidal protein Bt from the bacterium, Bacillus thuringiensis)can be isolated from another organism, such as a bacterium, and then inserted into a plant. The desired gene becomes part of the plant's DNA. The plant then expresses the incorporated gene and produces the pesticidal protein as it would one of its own components.

65.    Conventional breeding entails sexual and asexual reproduction to develop new plant varieties through selection, and only seeks to achieve expression of genetic material already present within a species.

66.    Genetic engineering requires insertion of unrelated genetic material, followed up by selection of the varieties to be used.

67.    The use of artificial GMOs in a product where the highlighted and emphasized ingredient is the apex of natural and simple is deceptive

68.    "Fresh" is one of the most valued descriptive food terms to consumers and its application differs depending on the product type and expectations.

69.    For mashed potatoes, a reasonable consumer understands "fresh" to mean they were "just prepared."

70.    This is because there must be human and mechanical intervention to convert a whole potato to the mashed form.

71.    The Products are represented as "fresh," claiming "Made With Fresh Whole Potatoes," though never actually claiming the Products *are* "fresh."

72.    Rather, the Products use the term "fresh" in a manner which causes consumers to be misled, because defendant knows over 80% of consumers erroneously believe refrigerated mashed potatoes are fresh.

13

73. This mistaken belief is known to defendant because of proprietary research conducted by one of its affiliated entities which manufactures and sells similar products.

74. It strains credulity that one company would carry out costly and valuable direct consumer research and not share that information with a sister company – defendant.

75. However, mass marketed refrigerated potato products such as Diner's Choice cannot be fresh because fresh mashed potatoes have a shelf-life between 7 and 10 days.

76. The Products are not fresh because their 3-month shelf life is due to artificial chemical preservatives including sodium benzoate, disodium pyrophosphate, potassium sorbate and sodium bisulfite.

77. These preservatives change the essential nature of an uncomplicated food –basic mashed potatoes (what consumers want) – to an artificial product they would avoid if they knew the truth.

78. Sodium bisulfite, a compound, artificial preservative, is used to slow the nonenzymatic browning of the Products and is made by reacting sulfur dioxide gas, SO2, in a solution containing sodium hydroxide, NaOH, or sodium carbonate, Na2 CO3.

79. Potassium sorbate, which inhibits microbial growth, is made through adding potassium carbonate to a solution of sorbic acid in a solvent of acetone, heating the mixture to reflux temperature and recovering potassium sorbate from the reaction mixture.

80. Disodium pyrophosphate prevents and reverses naturally occurring discoloration, or "after-cooking darkening, and is made through treating phosphoric acid with a sodium compound.

81.  No reasonable consumer expects that a simple, uncomplicated product like mashed potatoes, which touts as being "Made with Real Butter" and "Made with Fresh Whole Potatoes" will contain margarine, artificial preservatives and GMOs.

82.  Excluding tax, the Products cost no less than $3.99, a premium price compared to other similar products.

## Jurisdiction and Venue

83.  Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

84.  Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

85.  This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

86.  Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

87.  A substantial part of events and omissions giving rise to the claims occurred in this District.

## Class Allegations

88.  The classes consist of all consumers in the following states:  all, New York who purchased any Products with actionable representations during the statutes of limitation.

89.  A class action is superior to other methods for fair and efficient adjudication of this controversy.

90.  The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

15

91.     Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

92.     Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

93.     Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

94.     No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

95.     Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

96.     Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

97.     Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

<u>Parties</u>

98.     Plaintiff is a citizen of Kings County, New York.

99.     Defendant is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota.

100.    In 2017 and/or 2018, plaintiff purchased one or more of the Products for personal consumption, for no less than $3.99 per Product, excluding tax, within this district and/or State.

101.    Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

102.   Plaintiff incorporates by references all preceding paragraphs.

103.   Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

104.   Defendant's representations are false, unfair, deceptive and misleading for the reasons described herein.

105.   Plaintiff reasonably believed based on defendant's representations that the Products contained butter and not margarine, and were fresh, and did not contain artificial ingredients.

106.   Defendant's representations are false, deceptive and misleading for the reasons described herein.

107.   The representations and omissions were relied on by plaintiff and class members, who paid more than they would have otherwise, causing damages.

Negligent Misrepresentation

108.   Plaintiff incorporates by references all preceding paragraphs.

109.   Defendant misrepresented the composition of the Products (1) by highlighting butter, giving consumers the impression that they only contained butter to the exclusion of margarine, since consumers do not use butter and margarine on mashed potatoes and (2) implying the Products were fresh, which took advantage of mistaken consumer beliefs, when the Products are not fresh.

110.   Defendant had a duty to disclose and/or provide a non-deceptive description of the Products and knew or should have known same were false or misleading.

111.   This duty is based, in part, on defendant's position as a trusted brand who has made homestyle fare for Americans for decades.

112.   Defendant had a duty to disclose that it did not subscribe to the tastes of typical reasonable consumers when it comes to mashed potatoes.

17

113.   At the time of the representations, defendant knew or should have known same were false or misleading, or made them without knowledge of their truth or veracity.

114.   Defendant negligently misrepresented and/or negligently omitted material facts.

115.   Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

116.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability</u>

117.   Plaintiff incorporates by references all preceding paragraphs.

118.   Defendant manufactures and sells refrigerated mashed potato products.

119.   Defendant warranted to plaintiff and class members that the Products did not contain margarine and were fresh when this was not truthful and was misleading.

120.   Since it is not conceivable to have mashed potatoes with butter and margarine, no reasonable consumer would expect the Products to contain margarine.

121.   The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

122.   As a result, the Products lacked those attributes which are present in mashed potato products which contain butter to the exclusion of margarine and which are fresh.

123.   Plaintiff and class members relied on defendant's claims, paying more than they would have otherwise.

<u>Fraud</u>

124.   Plaintiff incorporates by references all preceding paragraphs.

125. Defendant's intent in making the "Made With Real Butter" and "Made With Fresh Whole Potatoes" claims was to take advantage of consumers' common expectations, which do not expect mashed potatoes to have butter *and* margarine and wrongly think refrigerated mashed potatoes are fresh.

126. Defendant's actions were motivated by increasing their market share amongst the many rival mashed potato companies.

127. Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have otherwise, entitling them to damages.

<u>Unjust Enrichment</u>

128. Plaintiff incorporates by references all preceding paragraphs.

129. Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of such inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE,** plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant(s) to correct the practices to comply with the law;

3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;

4. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

5.   Such other and further relief as the Court deems just and proper.

Dated:   October 19, 2018

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan (SS-8533)
891 Northern Blvd., Suite 201
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

Levin-Epstein & Associates, P.C.
Joshua Levin-Epstein
1 Penn Plaza, Suite 2527
New York, NY 10119
(212) 792-0046
joshua@levinepstein.com

Paskowitz Law Firm, P.C.
Larry Paskowitz
208 East 51st Street, Suite 380
New York, NY 10022
(212) 685-0969
lpaskowitz@pasklaw.com

1:18-cv-02250-NGG-RML
United States District Court
Eastern District of New York

Marilyn Reyes individually and on behalf of all others similarly situated

Plaintiff

- against -

Crystal Farms Refrigerated Distribution Company

Defendant(s)

## First Amended Complaint

Sheehan & Associates, P.C.
891 Northern Blvd., #201
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  October 19, 2018

/s/ Spencer Sheehan
Spencer Sheehan